UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DESMOND A. WILLIAMS,

       Petitioner,

                            CASE NO. 4:07-CV-11189
v.                          JUDGE PAUL V. GADOLA
                            MAGISTRATE JUDGE PAUL KOMIVES

WILLIE SMITH,

       Respondent.[1]
_____/

## REPORT AND RECOMMENDATION ON RESPONDENT'S MOTION TO DISMISS (docket #5)

I.    RECOMMENDATION: The Court should conclude that petitioner's application for the writ of habeas corpus is barred by the one year statute of limitations contained in 28 U.S.C. § 2244(d). Accordingly, the Court should grant respondent's motion to dismiss (docket #5).

II.    REPORT:

A.    *Procedural Background*

Petitioner Desmond A. Williams is a state prisoner, currently confined at the Ionia Maximum Correctional Facility in Ionia, Michigan. Petitioner is serving a sentence of life imprisonment without parole imposed as a result of his 1990 state court convictions for first degree murder and felony firearm. Petitioner's application and the state court record reveal the following time line of the state court proceedings:

- Petitioner was convicted on December 18, 1990, following a jury trail in the Wayne County Circuit Court. On January 7, 1991, a judgment of sentence was entered, sentencing petitioner to a mandatory term of life imprisonment without parole on the

---

[1] By Order entered this date, Willie Smith has been substituted for Gerald Hofbauer as the proper respondent in this action.

murder conviction and a mandatory consecutive term of two years' imprisonment on the felony firearm conviction.

- Petitioner appealed as of right to the Michigan Court of Appeals. The court of appeals rejected petitioner's claims and affirmed his conviction on April 14, 1993. *See People v. Williams*, No. 138834 (Mich. Ct. App. Apr. 14, 1993) (per curiam).

- Petitioner filed an application for leave to appeal in the Michigan Supreme Court. The Supreme Court denied petitioner's application in a standard order on November 4, 1993. *See People v. Williams*, 444 Mich. 879, 511 N.W.2d 683 (1993).

- On June 12, 2002, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508. The trial court denied the motion on April 26, 2004.

- Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, which was denied in a standard order on October 20, 2005. *See People v. Williams*, No. 262021 (Mich. Ct. App. Oct. 20, 2005).

- Petitioner filed an application for leave to appeal in the Michigan Supreme Court, which was denied in a standard order on April 28, 2006. *See People v. Williams*, 474 Mich. 1126, 712 N.W.2d 459 (2006).

On March 13, 2007, petitioner filed this application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254.[2] As grounds for the writ, petitioner contends that the evidence was insufficient and the trial court erred in failing to grant a directed verdict; he was denied due process by the prosecutor's failure to produce a *res gestae* witness; and he was denied the effective assistance of both trial and appellate counsel. Respondent filed a motion to dismiss on May 31, 2007, arguing that petitioner's habeas application is untimely. Petitioner filed a response to the motion on June 20, 2007. For the reasons that follow, the Court should grant respondent's motion to dismiss.

---

[2]Although petitioner's application is file-stamped March 20, 2007, it is well-established that a habeas petition is deemed "filed" for purposes of the statute of limitations on the date the petitioner gives his motion to prison officials for mailing. *See In re Sims*, 111 F.3d 45, 47 (6th Cir. 1997); *Beckovich v. Coyle*, 22 F. Supp. 2d 722, 723 (N.D. Ohio 1998); *cf. Houston v. Lack*, 487 U.S. 266, 270 (1988). Petitioner's application is dated March 13, 2007. Accordingly, I assume that the petition was given to prison officials for mailing, and was thus "filed," on March 13, 2007.

B.  *Timeliness of Petitioner's Habeas Application*

Respondent argues that petitioner's application is barred by the one-year statute of limitations governing habeas petitions. On April 24, 1996, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1220 (Apr. 24, 1996). In relevant part, the AEDPA amended 28 U.S.C. § 2244 to provide a one year statute of limitations for habeas petitions. Specifically, the statute as amended by the AEDPA provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
> (A) the date on which the judgment became final by the conclusion of direct review of the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).[3]

As the language of the statute indicates, there are four possible dates on which the limitations period may begin to run. Petitioner does not argue, and petitioner's claims themselves do not suggest, that any of the provisions of subparagraphs (B) through (D) are applicable here. Thus, petitioner's application is governed by subparagraph (A). Under subparagraph (A) of § 2244(d),

---

[3]The AEDPA codified a one-year statute of limitations provision for motions to vacate federal convictions brought under 28 U.S.C. § 2255 which is nearly identical to the one found in § 2244(d)(1). *See* 28 U.S.C. § 2255 para. 6. Accordingly, cases discussing the § 2255 statute of limitations are applicable here.

> a judgment of conviction does not become "final" . . . until the Supreme Court affirms the conviction and sentence on the merits or denies a timely filed petition for certiorari.
>
> In addition, if a defendant does not file a certiorari petition, the judgment of conviction does not become "final" until the time for seeking certiorari review expires.

*Kapral v. United States*, 166 F.3d 565, 570-71 (3d Cir. 1999); *see also*, *United States v. Simmonds*, 111 F.3d 737, 744 (10th Cir. 1997) (conviction became final upon denial of certiorari); *Torres v. Irvin*, 33 F. Supp. 2d 257, 271 (S.D.N.Y. 1998) ("[A] judgment of conviction only becomes final upon the expiration of the ninety days to seek a writ of certiorari from the United States Supreme Court."); *United States v. Dorsey*, 988 F. Supp. 917, 918 (D. Md. 1998) (same); *cf. Penry v. Lynaugh*, 492 U.S. 302, 314 (1989) (for purpose of determining whether application of new rule of law would be an impermissible retroactive application to a case which has already become final, conviction becomes final upon denial of the defendant's petition for certiorari); *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987) ("By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.").

Here, it is clear that petitioner's convictions became final before the enactment of the AEDPA. The Michigan Supreme Court affirmed petitioner's conviction on November 3, 1994, and his conviction became final 90 days later when his time for seeking *certiorari* in the United States Supreme Court expired. Because petitioner's conviction became final prior to the adoption of the AEDPA, he had one year from the AEDPA's enactment in which to file a habeas petition. *See Brown v. O'Dea*, 187 F.3d 572, 576-77 (6th Cir. 1999); *Abreu v. Hoffman*, 82 F. Supp. 2d 749, 752 & n.2 (N.D. Ohio 2000); *Thomas v. Straub*, 10 F. Supp. 2d 834, 835 (E.D. Mich. 1998) (Duggan, J.). Thus, the limitations began to run on April 24, 1996 and expired one year later, on April 24,

4

1997, absent any tolling. Because petitioner did not file his petition until March 13, 2007, it is barred by the statute of limitations unless the limitations period was tolled for any reason.

Pursuant to the provisions of § 2244(d)(2), the limitations period is tolled for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending[.]" Petitioner's motion for relief from judgment was filed in the trial court on June 2, 2002. At this time, the limitations period had been expired for over five years. It is well established that subsection (d)(2) is a tolling provision and therefore a post-conviction motion only pauses the limitations clock; it "does not reset the date from which the one-year statute of limitations begins to run." *Smith v. McGinnis*, 208 F.2d 13, 17 (2d Cir. 2000); *see also*, *Brooks v. McKee*, 307 F. Supp. 2d 902, 905 (E.D. Mich. 2004) (Gadola, J.). By the time petitioner filed his motion for relief from judgment, the one-year limitation period had already expired, and thus this filing cannot serve to toll the limitations period. *See Webster v. Moore*, 199 F.3d 1256, 1259 (11th Cir. 2000); *Jackson v. Dormire*, 180 F.3d 919, 920 (8th Cir. 1999) (per curiam); *Smith v. Stegall*, 141 F. Supp. 2d 779, 782-83 (E.D. Mich. 2001) (Gadola, J.).

Petitioner argues that the limitations period did not run under (d)(2) because the state court proceedings were running throughout his direct appeal and post-conviction proceedings. However, under § 2244(d)(1)(A), the conclusion of his direct review proceedings commenced the limitations clock. The clock was not tolled until there was a "pending" state postconviction motion, 28 U.S.C. § 2244(d), which did not occur until petitioner filed his motion on June 2, 2002. The interval between the conclusion of petitioner's direct review proceedings and the commencement of his postconviction proceedings is not excludable from the limitations period. *See Berry v. Ault*, 312 F.3d 948, 950 (8th Cir. 2002); *Nino v. Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999).

C.    *Actual Innocence*

Apart from his § 2244(d)(2) tolling argument discussed above, petitioner does not contest the foregoing calculation of the limitations period. Rather, he contends that he is entitled to consideration of the merits of his petition notwithstanding its untimeliness because he is actually innocent. The Court should reject this claim.

The Sixth Circuit has held that the actual innocence exception, which allows a court to review the merits of a habeas claim notwithstanding a procedural default, likewise exists for the habeas statute of limitations. *See Souter v. Jones*, 395 F.3d 577, 598-602 (6th Cir. 2005). In order to be entitled to the actual innocence exception, a petitioner must present "new and reliable evidence that was not presented at trial" that "show[s] that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 299 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327 (internal citation and quotation omitted). It is not sufficient to show merely that the evidence raises a reasonable doubt which did not otherwise exist. *See id*. at 329 ("The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty."). "Examples of evidence which may establish factual innocence include credible declarations of guilt by another, trustworthy eyewitness accounts, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996) (citations omitted); *accord Schlup*, 513 U.S. at 324 (referring to "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence"). *See generally*, *Souter*, 395 F.3d at 589-90.

Petitioner does not support his claim of innocence with any new, reliable evidence which would have led the trier of fact to acquit him. In large part, petitioner's innocence claim is based on the ineffective assistance claims asserted in his petition and his assertion that the evidence was insufficient to support his conviction. To the extent that petitioner's claim is based on the evidence which was adduced at trial, a rehashing of the evidence presented at trial is insufficient to make out an actual innocence claim. *See Spencer v. White*, 265 F. Supp. 2d 813, 818 (E.D. Mich. 2003) (Gadola, J.); *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1191 (E.D. Mich. 2001) (Tarnow, J.). Likewise, to the extent that petitioner's claim is based on the alleged unconstitutional errors in his trial, this claim is without merit. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Thus, to establish the actual innocence exception "petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Petitioner's habeas claims assert only legal insufficiency, not factual innocence.

The only new evidence to which petitioner points is an affidavit from Damon Fields, who claims to have been an eyewitness, executed on May 28, 2003. This affidavit, however, does not constitute the type of new, reliable evidence sufficient to make out an actual innocence claim. At the outset, there was extensive evidence against petitioner presented at trial, as summarized by the Michigan Court of Appeals:

> The victim, sixteen-year-old Larry Reed, had gone to a neighborhood store in Inkster with his friend Malcolm Ross on the morning of August 8, 1990. The two purchased juice drinks and sat together for some time on a log in a field across the street from the store. Eventually, a number of other people gathered in the area, including, according to Ross' testimony, defendant. Ross noticed that defendant's face was bruised all over, and asked him why. Defendant told Ross that some guys had jumped on him in Detroit. The conversation ceased after that, though defendant remained nearby while Reed and Ross continued to converse together and with

7

others. Some minutes later, Ross heard a shot behind him, and turned around to see defendant with a gun in his hand, pointed at Reed's back. The gun looked like "a silver .25." Defendant told Ross and Reed, "Check that change in, who'e," which Ross understood to be a demand for money. Ross and Reed both ran across the street towards the store. Reed fell as he reached the store. Ross testified that he heard additional shots fired from behind before Reed fell. Ross continued to run, and was able to enter the car of a passerby. Ross heard another shot as the car pulled away.

Police Officer Barry Dobos, alerted by police dispatch, arrived on the scene in time to see Reed lying on his back, and people running. He chased a possible suspect, but was unsuccessful. A second officer, Charles Givens, arrived a few minutes later, examined Reed, but found no pulse. Approximately thirty people standing nearby stated that they did not see anything. The autopsy report disclosed that Reed died from two gunshot wounds, one to the upper left back, which penetrated Reed's left lung and both left chambers of his heart, and one to the upper right abdomen. The abdominal wound was a close-range front-entry wound. According to the medical examiner, neither wound would have been immediately fatal, but survival time after each would be estimated in minutes. The effect of the second gunshot wound was to hasten death by several minutes.

On August 9, 1990 a caller directed police to "Pee Wee," formally named Richard Scott. Officer Givens interviewed Scott, who in turn, directed police to defendant, nicknamed "Mo-Mo." When Givens and other officers apprehended defendant the next day, they found that both his eyes were black, his mouth was swollen and bruised, his face was scratched and bruised, and there were lacerations on his scalp.

At trial, Richard Scott testified that some time before the shooting, defendant told Scott that he intended to "stick up" Reed and Ross. Scott testified that Reed and Ross had "showed a lot of money," and that early on the day of the shooting, Reed, walking with Ross past Scott's house, had stopped to show Scott a pocket full of money and rocks of cocaine. Later, Scott also saw defendant, who was "beat up." Still later, Scott went with his brother and a friend to the store. He saw Reed and Ross sitting together on the log, but did not talk to them.

Scott testified that he returned to the area with his brother to "go get something" and was talking with two friends when he heard a shot. He looked through an alley and saw Reed and Ross in the street, running from the log to the building. Reed was holding his back. Scott saw that there was a red spot on Reed's back. He said he did not see anyone chasing them. Scott and his brother left the scene to avoid the police. Scott testified that he had nothing to do with Reed's shooting, did not know who had anything to do with it, and would probably tell if he knew.

On redirect examination, Scott was asked about the information he had given to Officer Givens. Scott acknowledged that Givens had asked him if he saw the shooting, and that he had told Givens that he saw defendant come up behind Reed and shoot the gun. He also acknowledged that he told Givens that "Mo-Mo" walked up to Reed while he was lying on the ground, bent over him, trying to take something

out of his pockets, and shot Reed while he was lying on the ground, bent over him, trying to take something out of his pockets, and shot Reed on the ground. While acknowledging that he made these statements to Givens, Scott denied having witnessed the events himself. Instead, he asserted, he was communicating what someone else had told him of the details. On recross, he acknowledged that he had seen a dead body, but repeated that he had not himself seen what he described to Givens. . . .

[The trial judge then, outside the presence of the jury, informed Scott that he believed that Scott had witnessed the shooting and had perjured himself at trial, suggesting that he would be charged with perjury by the prosecutor. Following a recess, Scott informed the court that he wished to testify again.]

Stating that he had not told the truth the first time because he had been threatened by some of defendant's acquaintances, Scott testified that when he heard the shot and saw Reed running across the street, he saw defendant chasing Reed. Defendant had a silver .25. After Reed fell, Scott saw defendant run over to him, check his pockets, and shoot Reed in the chest. Defendant ran when the first police officer arrived, going first to Scott's house, and then to Scott's grandmother's house, where Scott had gone, attempting to avoid involvement. A mutual friend drove defendant from Scott's grandmother's house to Taylor. Defendant called Scott from there, and told him where he had thrown the gun.

*People v. Williams*, No. 138834, slip op. at 1-2 (Mich. Ct. App. Apr. 14, 1993). Against this evidence, Fields avers that it was Scott, not petitioner, who shot Reed. Fields asserts that Scott told him that Reed and Ross owed Scott money, that Scott went straight to Reed and Ross while he and petitioner went to talk to another person, and that after hearing a shot coming from the direction of Scott, Reed, and Ross, he saw Scott follow Reed into the alley, and saw Scott going through Reed's clothes. He then heard another shot. *See* Fields Aff., ¶¶ 2-5.[4] Fields avers that he saw Scott in jail 30 days later, and told Scott that he could not let petitioner take the fall. Scott agreed, and told him that he was going to testify at petitioner's trial that he did not see anything. Fields did not see Scott after that, and Fields assumed petitioner had been found not guilty. *See id.*, ¶ 6. Fields avers that

---

[4]Petitioner states that the affidavit is attached to his habeas application, but it is not. Nevertheless, Fields's affidavit is attached to petitioner's supplemental brief in the Michigan Court of Appeals in connection with his motion for relief from judgment, submitted by respondent in this case.

he did not come forward earlier because he thought that Scott had testified that he did not see anything and that petitioner had been found not guilty. *See id.*, ¶ 7.

Fields's affidavit does not constitute the type of "new, reliable" evidence of actual innocence sufficient to meet the actual innocence exception. First, new statements from witnesses years after the crime are inherently suspect, *see Schlup*, 513 U.S. at 331, and such statements are to be viewed with "a degree of skepticism." *Herrera*, 506 U.S. at 423 (O'Connor, J., concurring). Further, Fields's account conflicts with the substantial eyewitness testimony of Ross and Scott at trial. While Fields avers that Scott lied at trial to cover up his own involvement in the crime, no other evidence in the record suggests that Scott committed the murder. On the contrary, Ross unequivocally identified petitioner as the shooter, and the portions of Ross's testimony describing the shooting were corroborated by the physical evidence. Further, Ross's testimony was consistent with the testimony which Scott ultimately gave at trial, lending further credence to both of their testimony. In light of these contradictions between the eyewitness testimony at trial on the one hand and Fields's affidavit on the other hand, Fields's affidavit does not provide credible evidence of petitioner's innocence. *See Herrera*, 506 U.S. at 418; *United States ex rel. Allen v. DeTella*, No. 95 C 4226, 1996 WL 99427, at *3 (N.D. Ill. Mar. 4, 1996) (affidavit of another witness who claimed to have witnessed the crime for which the petitioner was convicted insufficient to establish actual innocence: "The affidavit of Calvin Snowden, who himself is serving a sentence on a drug and murder case, standing alone against the testimony of the victim and others, does not establish 'probable actual innocence,' much less, clear and convincing evidence of actual innocence."). Accordingly, the Court should conclude that petitioner has failed to establish his actual innocence sufficient to overcome his failure to comply with the statute of limitations.

D.  *Conclusion*

In view of the foregoing, the Court should conclude that petitioner's application for the writ of habeas corpus is barred by the statute of limitations governing habeas petitions. Accordingly, the Court should grant respondent's motion to dismiss and should dismiss the petition.

III.  NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 5/28/08

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on May 28, 2008.

                                  s/Eddrey Butts
                                  Case Manager